**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| A.T.N., INC., | ) |
| Plaintiff, | ) |
| v. | ) No. 05 C 7286 |
| McAIRLAID'S VLIESSTOFFE GMBH & CO., KG, <u>et al.</u> | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

Before the court are two motions: (1) defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56; and (2) defendants' motion to strike. For the reasons explained below, the motion for summary judgment is granted, and the motion to strike is denied.

**BACKGROUND**

This case concerns the binding effect of a letter of intent executed by plaintiff A.T.N., Inc. ("ATN"), defendant McAirlaid's Vliesstoffe GmbH & Co. KG ("McAirlaid's") and certain of McAirlaid's affiliates. McAirlaid's is a German entity that manufactures "absorbent cores" used in various medical devices. (Def. Stmt. of Undisputed Facts in Support of Their Mot. for Summ. J. (hereinafter "Def. SOF"), ¶ 2.) Defendant Newco Absorbents GmbH & Co. KG ("Newco"), a McAirlaid's affiliate, uses McAirlaid's

absorbent cores to manufacture finished hygiene products, such as absorbent underpads used in hospitals. (Id. at ¶ 4; Maksimow Decl. at ¶ 4.) Airlaid Alliance Sp.z.o.o. ("AA"), also a McAirlaid's affiliate, supplies the machines used to manufacture both the absorbent cores and the finished products. (Id. at ¶ 6; Maksimow Decl. ¶ 5.) Plaintiff A.T.N., Inc. ("ATN") is an Illinois-based company that provides "finance and marketing services to businesses." (Azaraf Aff. ¶ 3.) ATN's sole shareholder is Yossi Azaraf. (Id. at ¶ 2.)

## A. The Letter of Intent

Azaraf and McAirlaid's CEO Alex Maksimow met in 2004 to discuss marketing McAirlaid's products in the United States. (Pl.'s L.R. 56.1(a) Resp. and Aff. Stmt. of Facts in Opp'n to Def.'s Summ. J. Mot. (hereinafter "Pl. SOF"), ¶ 38.)[1] In connection with these discussions, Azaraf enlisted a potential investor, Robert Shapiro, the CEO of Illinois-based Emlin Company ("Emlin"). (Id. at ¶ 39; Def. SOF ¶ 10.) Azaraf and Shapiro traveled to Germany in early September 2004 to meet with McAirlaid's representatives, including Maksimow. (Pl. SOF ¶ 39.) This meeting culminated in a three-page "Letter of Intent," signed by ATN, AA, McAirlaid's and Newco (but not Emlin). (See Def. SOF,

---

[1] Defendants have moved to strike portions of Azaraf's affidavit and certain paragraphs of ATN's statement of facts based on that affidavit. We have not relied on any of the challenged statements in reaching our decision and therefore deny defendants' Motion to Strike (88) as moot.

Ex. C.)  The "Preamble" to the Letter of Intent (the "LOI") states that (a) ATN "wishes to develop sales of hygiene products in the North American market based on finished products manufactured by Newco," and (b) "Newco will supply and invoice ATN Inc. for the products.  ATN will distribute the products and invoice the final customer."  (Id.)  Under the heading "Agreement," the parties set forth a series of "steps" intended to "support the development of this business [i.e., the business described in the Preamble] in North America."  (Id.)  These steps include the following:

- ATN "will" use its "best efforts to rapidly develop sales of finished products made by Newco."  Newco, for its part, agrees to "support these sales efforts with joint customer visits when requested."  (Id. at ¶ 1.)

- Newco "will" grant ATN the exclusive right to market Newco's products in North America for a one-year period beginning on the date of the LOI.  (Id. at ¶ 3.)

- ATN "intends" to install "converting equipment" in North America.[2]  An "initial decision on this investment will take place 4-6 months after commencement of this agreement based upon market acceptance of these products."  (Id. at ¶ 2.)

- ATN "intends" to install a "turnkey airlaid non-woven manufacturing line supplied by AA.[3]  A decision on the timing of this investment will follow the order for the converting machines."  (Id. at ¶ 4.)

---

[2]  Converting equipment "cuts to specification the bulk-rolled 'airlaid non-woven' absorbent material shipped from Defendants' manufacturing facility in Germany."  (Azaraf Aff. ¶ 8.)

[3]  The "turnkey airlaid non-woven manufacturing line" produces the absorbent material that the converting machine converts into finished products. (Azaraf Aff. ¶ 9.)

- AA "will offer ATN the right of first refusal for the first North American manufacturing license." (Id. at ¶ 5.) If ATN exercises the license option, McAirlaids agrees to "transfer its North American hygiene customers to ATN when the airlaid line has been commissioned . . . ." (Id. at ¶ 6.)

- Finally, the LOI states that "[c]ustomers of ATN who purchase the products will remain exclusive to ATN for as long as they continue to purchase the products from ATN and ATN purchases the products from Newco in the agreed quantities." (Id. at ¶ 7.)

**B.   Post-LOI Negotations and Product Marketing**

In November 2004, Azaraf, Shapiro and Maksimow toured Emlin's facility to determine, according to ATN, whether it would be a suitable location to install a converting line. (Pl. SOF ¶ 41.) Shortly afterwards, Emlin's attorney sent defendants a "Proposed Term Sheet" that would have given Emlin extensive rights to market the defendants' products without any firm commitment to purchase a converting machine or a manufacturing line. (Id. at ¶ 42; Proposed Term Sheet, attached as Ex. B to Azaraf Dep.) The parties dispute ATN's role in Emlin's proposal,[4] but it is undisputed that defendants did not agree to it. ATN, meanwhile, began purchasing finished "underpads" from Newco and reselling them to Medline

---

[4]/   ATN contends that it was "united" with Emlin, and that the Proposed Term Sheet was a joint ATN/Emlin proposal. (See Maksimow Dep. at 28.) Shapiro testified, ambiguously, that Azaraf "was always in the deal" even if Emlin's written proposal did not specify any particular role for Azaraf or ATN in the transaction. (Shapiro Dep. at 40-41, 63.) Defendants insist that Emlin's Proposed Term Sheet and the LOI were entirely independent. (See Def. Resp. to Pl. SOF ¶ 42.)

Industries, Inc. ("Medline"), an Illinois-based medical products manufacturer and distributor. (See "A.T.N. Sales by Customer Detail," attached as Group Ex. 7 to Azaraf Dep. (listing an initial sale to Medline of $16,555.00 on November 29, 2004).)

On March 4, 2005, an AA representative sent Azaraf and Shapiro a letter outlining a proposed joint venture between Emlin, ATN and AA. (Def. SOF ¶ 17.) AA proposed to install a converting machine and a manufacturing line in exchange for between $40-44 million from "Emlin/ATN" and a 25% equity interest in the venture. (See March 4, 2005 Letter, attached as Ex. 6 to Azaraf Dep.) In addition to financing installation, "Emlin/ATN" would be responsible for "developing sales." (Id.) Both Azaraf and Shapiro balked at the proposal (see Azaraf Dep. at 96-98; Shapiro Dep. at 69, 71), but it is unclear whether they articulated any specific objections at the time.[5] In any event, the parties did not make any progress towards reaching a final agreement. While these negotiations were ongoing, ATN continued selling underpads to Medline. (See "A.T.N. Sales by Customer Detail," attached as Group Ex. 7 to Azaraf Dep.) ATN also communicated with several other companies about purchasing defendants' products (see, e.g., Azaraf Dep. at 119), but Medline remained its only customer.

---

[5] Defendants claim that ATN never responded to their proposal, whereas ATN asserts only that it never responded "in writing." (Compare Def. SOF ¶ 17, with Pl. SOF ¶ 18.)

After defendants' joint-venture proposal, negotiations appear to have been strained. On May 10, 2005, an AA representative sent Shapiro a letter (copying Azaraf) expressing impatience with the pace of the negotiations. (See May 10, 2005 Letter, attached as Ex. 6 to Shapiro Dep.) The letter offered to discuss revising the terms of the joint venture, but requested a "final decision" by May 31, 2005. (Id.) Shapiro, for his part, continued to insist that the parties proceed with Emlin's earlier proposal. (Shapiro Dep. at 72, 74.) The record does not reveal whether any negotiations occurred between the May 10, 2005 letter and a meeting between Azaraf and Maksimow in Paducah, Kentucky in October 2005. (Maksimow Dep. at 37.) At that meeting, Azaraf and Maksimow discussed Paducah as a possible location for a McAirlaid's production facility, and also discussed a possible minority interest (20%) for Azaraf in the business. (Maksimow Dep. at 37-38; Azaraf Dep. at 90.) Azaraf confirmed his interest in proceeding with the 20% minority investment, "regardless of Bob Shapiro's decision," in an email to Maksimow on October 24, 2005. (See Oct. 24, 2005 Email, attached as Ex. 7 to Shapiro Dep.) Ultimately, McAirlaid's chose to proceed without ATN's participation.

**C. Letter Terminating the Parties' Business Relationship**

On December 8, 2005, Maksimow sent Azaraf a letter effectively terminating McAirlaid's business relationship with ATN. (See Dec.

8, 2005 Letter, attached as Ex. K to Def. SOF.) In the letter, Maksimow confirmed McAirlaid's intention to proceed without any minority interest in a U.S.-based manufacturing facility. (Id.) He also stated that McAirlaid's would no longer accept ATN's product orders after fulfilling any orders open at that time. (Id.) Finally, Maksimow stated that Medline, still ATN's only customer, had agreed to purchase any additional products directly from Newco. (Id.)

ATN has filed a two-count complaint alleging breach of the LOI (Count I) and unjust enrichment (Count II); defendants now move the court for summary judgment on both counts.

## DISCUSSION

### A. Legal Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'"  Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question."  McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

**B.   Whether the Parties Extended the Exclusivity Period**

The LOI states that defendants "will grant ATN exclusive rights to market the products in North America for a period of 12 months from the date of this agreement."  (LOI ¶ 3.)  The parties agree that this provision was binding. (Def. Reply at 3.)  During the 12-month period ending in September 2005, and for a brief period thereafter, ATN and Emlin were the sole vendors of defendants' products in North America.  ATN contends, however, that the parties "mutually" agreed to extend the LOI's one-year exclusivity period.  (Pl. Opp'n at 13.)  On December 8, 2004, a McAirlaid's employee emailed Azaraf a draft form-letter, addressed "[t]o whom it may concern," that purports to summarize an "agreement" between McAirlaid's, ATN and Emlin.  (See Dec. 8, 2004 Letter, attached as Ex. 2 to Supp. Decl. of Alex Maksimow.)  The letter refers to "detailed negotiations . . . for the supply of manufacturing equipment," and states that "[f]or the period of these discussions and until end [sic] of 2005 ATN/Emlin have

exclusive rights to sell under pads produced by McAirlaid's/NewCo." (Id.) ATN seizes on the phrase "until end of 2005" and argues that the parties extended the exclusivity period until December 31, 2005.

Defendants respond that the letter is not a valid contract. See Schwinder v. Austin Bank of Chicago, 809 N.E.2d 180, 189 (Ill. App. 2004) ("[A] valid modification of a contract must satisfy all the criteria essential for a valid original contract, including offer, acceptance, and consideration."). "[A]n unbroken line of Illinois cases holds specifically that, without any sales quota or durational terms, a distributorship lacks mutuality and is not enforceable." Ryan v. Wersi Electronics GmbH and Co., 3 F.3d 174, 181 (7th Cir. 1993); see also Kraftco Corp. v. Kolbus, 274 N.E.2d 153, 156 (Ill. App. 1971). Although the December 8, 2004 letter reflects the purported amendment's duration (cf. Ryan, 3 F.3d at 179), it does not identify (nor has ATN articulated) any additional terms. Yet according to ATN, the letter is not merely evidence of an agreement, it *is* the agreement. (Pl. Opp'n at 13.) Even if we impute a good faith duty to market defendants' products, "such an obligation is still 'too indefinite and uncertain to be an enforceable standard.'" Id. at 181 (quoting Kraftco, 274 N.E.2d at 156). We hold that the letter is insufficient to create a material dispute respecting the parties' obligations under the LOI. ATN also claims that "[d]efendants on several occasions expressly

guaranteed that they would never visit any customer of ATN or Emlin . . . ." (Azaraf Aff. ¶ 27.) Azaraf's conclusory statement that besides the letter there were other, unspecified "guarantees" is insufficient to create a genuine issue of material fact. See <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

**B.  Whether the Parties Intended to Be Bound by the LOI's Other Provisions**

Defendants contend that the LOI was a framework for negotiations towards a final deal, not a binding contract. (Defs. Mem. at 5.)  See <u>A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.</u>, 873 F.2d 155, 158 (7th Cir. 1989) (A preliminary letter of intent is intended "to provide the initial framework from which the parties might later negotiate a final ... agreement, if the deal works out." (citation and internal quotation marks omitted)). In determining whether the parties intended to be bound, our focus is the parties' objective intent. <u>Quake Constr., Inc. v. Am. Airlines, Inc.</u>, 565 N.E.2d 990, 994 (Ill. 1990).  Their intent may be explicit, <u>see, e.g.</u>, <u>Berco Investments, Inc. v. Earle M. Jorgensen Co.</u>, 861 F.Supp. 705, 708 (N.D. Ill. 1994) ("This letter is not a binding agreement, but a summary of the basic business terms upon which Seller proposes to sell the Property."), or implicit.  See <u>Abbott Labs. v. Alpha Therapeutic Corp.</u>, 164 F.3d 385, 388-89 (7th Cir. 1999).  "[T]he

circumstances surrounding the negotiations, including the actions of the principals both during and after," are all relevant. A/S Apothekernes, 873 F.2d at 157. We also consider whether the letter of intent itself is sufficiently detailed given the complexity of the proposed undertaking. See Quake, 565 N.E.2d at 994 (Among the factors courts consider are "whether the agreement contains many or few details [and] whether the agreement involves a large or a small amount of money."). Other things being equal, it is unlikely that sophisticated parties intend to be bound by a skeletal agreement, containing few terms and conditions, when their transaction is complex and millions of dollars are at stake. A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc., 678 F.Supp. 193, 198 (N.D. Ill. 1988) (Observing that in complicated asset acquisitions a letter of intent "is generally a step to an end and not itself a contract.").

ATN accuses defendants of ignoring these factors and relying on the label "Letter of Intent" instead. (Pl. Opp'n at 2.) It then goes on to argue that the parties intended to be bound because the words "agreement" and "agreed" appear in the LOI and in the parties' post-LOI correspondence. We agree that labels are not dispositive, but it is a two-way street: neither the phrase "letter of intent" nor the word "agreement" ends our inquiry. But see Chicago Inv. Corp. v. Dolins, 481 N.E.2d 712, 716 (Ill. 1985) (Citing with approval the trial court's observation that the phrase

"letter of intent" "suggests preliminary negotiations, as opposed to a final and binding contract."). Moreover, ATN ignores the real thrust of defendants' argument. The LOI states that ATN "intends" to install one or more converting machines (paragraph 2) and a manufacturing line (paragraph 4). It establishes a time frame for an "initial decision" on the converting-machine "investment," with a "decision on the timing of" the manufacturing-line "investment" to take place thereafter. But it is not itself the decision to invest. Even if we assume that the "decision" was only a formality, the LOI does not contain even a broad outline of the machine sale's terms and conditions. Cf. Quake, 565 N.E.2d at 295 ("Many of the details regarding the project were included in the letter."). It does not include the price, terms and conditions of performance, risk allocation, etc. Cf., id. at 993 ("[T]his notice of award authorizes the work set forth in the following documents at the lump sum of $1,060,565.00."). The parties negotiated for months after executing the LOI without agreeing to any of these important terms. Their absence is "powerful evidence" that the parties did not intend to be bound. Haslund v. Simon Property Group, Inc., 378 F.3d 653, 654 (7th Cir. 2004).[6]

On the other hand, ATN began selling and marketing the defendants' products as early as November 2004 without awaiting a

---

[6] Even if we concluded that the LOI was a binding machine-sale contract, we would be required to supply all of the sale's essential terms, including price. We cannot, under the guise of interpretation, draft a contract for the parties. Haslund, 378 F.3d at 654.

"final" agreement.  Given this course of performance, it is superficially appealing to conclude that the parties only "agreed to agree" to the sale of the converting equipment and the manufacturing line, but nevertheless intended to be bound by the LOI's other provisions.  Arguably, this interpretation would give ATN exclusive rights to the Medline account for an indeterminate period of time, up to and including December 2005 when defendants announced their intention to do business with Medline directly:

> Customers of ATN who purchase the products will remain exclusive to ATN for as long as they continue to purchase products from ATN and ATN purchases products from Newco *in the agreed quantities*.

(LOI ¶ 7 (emphasis added).)  The problem with concluding that this provision is binding, notwithstanding the strong evidence that the machine-sale provisions are not, is that the parties did not specify what the "agreed quantities" were.[7]  ATN attempts to minimize this omission's impact, citing Robart Mfg. Co., Inc. v. Locite Group, No. 83 C 7288, 1986 WL 893 (N.D. Ill. Jan 9, 1986).  The Robart court noted that "when a contract is one for exclusive dealing, no specific quantity need be stated in the writings." Id. at *12.  This principle, which is a special application of the rule that a contract for the sale of goods must specify a quantity to be enforceable, does not apply here.  The issue here is the quantity

---

[7] In his deposition, Azaraf conceded that no benchmark had been agreed, stating that the parties' "relationship was friendly and we didn't want to go into details."  (Azaraf Dep. at 108.)

of products that ATN must purchase from Newco in order to maintain exclusivity. It is an important limitation on what would otherwise be an open-ended right. See Magid Mfg. Co. v. U.S.D. Corp., 654 F.Supp. 325, 333 (N.D. Ill. 1987) ("Under Illinois law, terms such as duration and sales quotas are considered essential terms of an agreement between a manufacturer and distributor."). Reserving this term for future negotiation is strong evidence that the parties did not intend to be bound. See Abbott Labs., 164 F.3d at 388("The fact that Jones left the details of a material term open to negotiation calls into question Abbott's intent to be bound at that time.").[8]

Viewing the LOI as a whole, and taking into account the months of negotiations after its execution, we conclude that parties did not intend to be bound to their "ultimate contractual objective." A/S Apothekernes, 873 F.2d at 158 ("[T]he purpose and function of a preliminary letter of intent is not to bind the parties to their ultimate contractual objective."). The nature and scope of the parties' relationship after the initial exclusivity period expired, if there was to be a relationship, depended on successfully negotiating the essential terms of the machine sale and long-term

---

[8] Again, see supra n.9, even if we concluded that the parties intended to be bound, "agreed quantities" is not a term that we can "reasonably be asked to supply in the name of interpretation." Haslund, 378 F.3d at 654. We cannot reasonably infer that the parties implicitly agreed to an essential term they expressly reserved for future agreement. Hintz v. Lazarus, 373 N.E.2d 1018, 1020 (Ill. App. 1978) ("When any essential term of an agreement is left to future negotiation, there is no binding contract.").

exclusivity. By December 2005 the parties had exceeded the time frame for ordering a converting machine by more than six months. At that point, it appears that the parties were no closer to an agreement than they were in March of that year. We conclude that the defendants were permitted at that point to walk away from the negotiating table. In doing so, they did not violate any binding provision of the LOI.

## D. Whether Defendants Breached Their Duty to Negotiate in Good Faith

ATN argues that the implied duty of good faith prohibited defendants from usurping ATN's relationship with Medline. (Pl. Opp'n at 10-11.) The implied duty of good faith is not "an independent source of duties assumed by parties to a contract." See Williams v. Jader Fuel Co., Inc., 944 F.2d 1388, 1394 (7th Cir. 1991). Accordingly, the duty is not a basis for granting ATN the benefits of a contract that the parties could not successfully negotiate. See A/S Apothekernes, 873 F.2d at 159 n.2 ("Apothekernes is relying on a rule of contract construction in a situation where, as we have previously stated, a binding sale never existed.").[9] Nevertheless, a letter of intent may create a duty to

---

[9] ATN also makes the strained argument that the "best efforts" clause created an implied requirements contract obligating defendants to supply ATN indefinitely. ATN was not obligated to purchase its "products" requirements from defendants; accordingly, there is no basis to infer a corresponding obligation to supply those requirements. See In re Modern Dairy of Champaign, Inc., 171 F.3d 1106, 1108 (7th Cir. 1999) (The inference of an implied requirements contract "would be compelling if the contracts forbade the districts to turn elsewhere for milk.").

negotiate in good faith, even though the parties are not bound to their ultimate contractual objective. Id. Without explicitly invoking this doctrine, ATN implies that defendants negotiated in bad faith. For example, ATN claims that defendants entirely "refus[ed] to negotiate the terms of ATN's investment in converting equipment." (Pl. Opp'n at 12.) In fact, the parties describe several meetings over the course of 2004 and 2005 during which they attempted to hash out acceptable terms for a final agreement. Each side faults the other for not clearly articulating its position, but the fact that the parties talked past each other does not mean that they did not negotiate.

There is, however, more than one way to scuttle a deal. The duty to negotiate in good faith prevents one party from "insisting on conditions that do not conform to the preliminary agreement." Milex Products, Inc. v. Alra Laboratories, Inc., 603 N.E.2d 1226, 1234 (Ill. App. Ct. 1992). ATN contends that defendants' March 4, 2005 proposal did not conform to the LOI, citing AA's proposed equity interest in the venture and the simultaneous commitment to purchase a converting machine and a manufacturing line. First, the LOI merely states that ATN "intends to install" defendants' proprietary machinery. Ownership is just one of the many aspects of the transaction that the parties left for further negotiation. See A/S Apothekernes, 873 F.2d at 159 ("[T]he scope of any obligation to negotiate in good faith can only be determined from

the framework the parties have established for themselves in their letter of intent."). ATN's second objection is more substantive, although ultimately unavailing. Defendants' March 2005 proposal contemplates a commitment by "ATN/Emlin" to "install and run an Airlaid manufacturing and converting facility in the USA." The LOI provides that a decision on the "timing" of the manufacturing-line investment would "follow the order for converting machines." (LOI at ¶ 4.) ATN argues that the defendants' proposal jumped the gun, requiring a commitment to purchase the $40 million manufacturing line before a converting machine had been ordered. By March 4, 2005, the LOI's 4-6 month time frame for making an "initial decision" on the converting machine was drawing to a close. Proposing a simultaneous investment at that stage of the negotiations, when the parties may well have expected that a converting machine would have been "ordered" already, is not so far outside the LOI's framework as to constitute bad faith.[10] Ultimately, defendants wanted ATN to commit to purchasing machinery. (See LOI ¶¶ 2 and 4; March 4, 2005 Letter.) ATN and Emlin evidently wanted to defer that purchase indefinitely. (See Proposed Term Sheet ¶¶ 5, 11, 23.) Each side, in the normal give-

---

[10]/ ATN also alleges that, at some point, defendants awarded the first North American manufacturing license to a company owned by Alex Maksimow. Because defendants were not required to grant the manufacturing license to ATN, the license's ultimate recipient is irrelevant. If, on the other hand, ATN is suggesting that Maksimow and/or defendants wanted their deal with ATN to fail, it has not cited any evidence to support that accusation.

and-take of negotiations, proposed terms furthering its own interests. We see no bad faith here.

**D.    Unjust Enrichment**

ATN claims that defendants usurped the benefits of business relationships that ATN spent time, effort and money developing. To prevail on its unjust-enrichment claim, ATN must prove that defendants "unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc., 545 N.E.2d 672, 679 (Ill. 1989).  But unjust enrichment is not available "[w]here there is a specific contract that governs the relationship of the parties." Guinn v. Hoskins Chevrolet, 836 N.E.2d 681, 704 (Ill. App. 2005).  Parties may, however, plead breach of contract and unjust enrichment in the alternative. See id.

We have concluded that the LOI did not bind the parties to their "ultimate contractual objective," but this is not the same as saying that no "specific contract . . . governs the relationship of the parties."  Marketing defendants' products to prospective customers in North America, before negotiating the essential terms of a long-term business relationship, was part of the LOI's

"framework."[11] Pursuant to that framework, ATN's efforts were rewarded, insofar as they were successful, with the profits it made from sales to its customers. By agreeing to this arrangement, ATN accepted the risk that the parties would not reach a final agreement. Utility Audit, Inc. v. Horace Mann Service Corp., 383 F.3d 683, 689 (7th Cir. 2004) ("Unjust enrichment is not a means for shifting risks assumed under a contract."). We hold that defendants are entitled to summary judgment on ATN's unjust-enrichment claim.

## CONCLUSION

Defendants' motion to strike (88) is denied as moot. Defendants' motion for summary judgment (57) is granted.

DATE: March 11, 2008

ENTER: _____
John F. Grady, United States District Judge

---

[11]/ See Johnson v. Gudmundsson, 35 F.3d 1104, 1114 (7th Cir. 1994) (Unjust enrichment does not apply "where preliminary services are conferred for business reasons, without the anticipation that reimbursement will directly result, but rather, with the expectation of obtaining a hoped-for contract and incidental to continuing negotiations related thereto." (quoting Rutledge v. Housing Authority of City of East St. Louis, 411 N.E.2d 82, 86 (Ill. App. 1980))(internal quotation marks omitted)).